(101 South. 47)

### MANCHESTER SAWMILLS v. JASPER LAND CO. (6 Div. 996.)

(Supreme Court of Alabama. June 26, 1924.)

Appeal from Circuit Court, Walker County; R. L. Blanton, Judge.

Bill in equity by the Jasper Land Company against the Manchester Sawmills. From a decree overruling demurrer to the bill respondent appeals. Affirmed.

Bankhead & Bankhead, of Jasper, for appellant.

A. F. Fite, of Jasper, for appellee.

For briefs, see report of former appeal. 209 Ala. 446, 96 South. 417.

THOMAS, J. The present appeal invokes a rehearing of the former decision on construction given the contract of sale of lands or timber rights thereon. Jasper Land Co. v. Manchester Sawmills, 209 Ala. 446, 96 South. 417.

The decree is in conformity with the former judgment of this court, and we do not depart therefrom. Demurrer to the bill was properly overruled on the phase of the bill pointed out in the former opinion.

The decree of the circuit court, in equity, is affirmed.

Affirmed.

ANDERSON, C. J., and SAYRE, SOMERVILLE, GARDNER, and MILLER, JJ., concur.

BOULDIN, J. (dissenting). The nature and purpose of the bill are shown in the former decision. Jasper Land Co. v. Manchester Sawmills, 209 Ala. 446, 96 South. 417. When the cause was remanded to the court below, a decree was rendered overruling the demurrer to the bill as directed. From this decree the present appeal is taken.

The major object of the bill is to enjoin the further cutting and removal of timber upon the ground that the period of removal had expired, the title had reverted, and the defendants were committing waste as against their cotenant. By alternate averments, the bill sets up abuse of the right of removal by unnecessary injury to the soil and destruction of small timbers not conveyed to respondents. The bill makes no complaint that respondents were claiming and cutting as their own timbers not covered by the timber deed. However, in passing upon the right and measure of alternate relief sought by the bill, and as a guide to the lower court, this court proceeded in the former opinion to define what timbers passed by the deed.

This issue is brought up for further review. Owing to the importance of the question, not only on principle, but in the further progress of the cause between these litigants, as well as all further operations under the contract, the writer deemed this the proper time to again carefully consider the proper construction of the deed under which respondents derive their right to the timber.

By the contract of March 12, 1902, the grantor "agrees to sell and convey * * * all the timber growing, standing, lying or being upon the lands," and also $51/100$ interest in the surface. In the deed of October 18, 1905, made pursuant to the contract, the general granting clause is in substantially the same words as the contract.

The contract reserves all minerals and mining privileges in the following words:

"The said party of the first part to retain and own all the coal, iron, oil and other minerals in, under and upon said lands, together with the usual right and privileges of mining the same."

The deed defines the reservation thus:

"Excepting and reserving to the said grantor all the coal, oil, iron and other minerals in, under and upon said lands, together with the usual rights and privileges of mining the same; provided that this clause in reference to oil, minerals and mining rights, is not to be construed to give to the grantor the right to cut any trees

on said land of diameter greater than six inches at the stump, at the time any of such trees are used by the grantor; and the said grantees may cut and remove from said lands any trees exceeding six inches at the stump at the time of such cutting."

Note that in the general granting clause of both contract and deed the timber conveyed is not specified other than as implied in general terms of the grant. Note also that in the contract the mining rights reserved are described in the most general terms,—the usual mining rights and privileges.

In the deed a distinct proviso is added specifying the timber to be cut under the mining privilege and also in the timber operations.

Later on in the deed is conveyed the timber and a like interest in the surface of lands wherein mineral interests are believed to be owned by outside parties. Here again the deed reserves such minerals and mining privileges as may not be owned by outsiders, and defines the rights of the parties in the timber in these words:

"But the last reservation or exception shall not be construed to give the grantor the right to cut and use any trees on the lands to which such exception applies of greater diameter than six inches at the stump at the time they may be so cut and used; and the grantees may cut and take from the lands to which said last reservation or exception applies all trees exceeding in diameter six inches at the stump, at the time of such cutting."

For a full study of the effect of these stipulations, I call attention to two other clauses as they appear in the contract and in the subsequent deed, By both the contract and deed the grantors were to pay all taxes assessed against the property to the date of the contract.

Thereafter the contract makes the following stipulation as to payment of taxes, etc.:

"And the said parties of the second part further agree to pay all of the taxes that may hereafter be assessed or accrue against said property: Provided, however, that if the timber has been cut and removed from any legal subdivision of said lands, the purchasers may notify the Jasper Land Company in writing of such cutting and removal, and thereafter their right to cut and remove timber from such subdivision shall cease, and the taxes assessed or accruing against the same thereafter shall be paid, $49/100$ by the Jasper Land Company and $51/100$ by the undersigned purchasers."

In the deed this provision is made to read thus:

"The said grantees are to pay all taxes special and general that may be assessed or levied against any of the property conveyed by this deed after the 12th day of March, 1902.

"It is further provided that when the grantees herein shall cut and remove the timber from any legal subdivision of said land, they shall notify the Jasper Land Company in writing of such cutting and removal describing the land so cut, and thereafter their right to cut and remove timber from such subdivision shall cease.

"The taxes assessed against the surface of said lands after such notice is given shall be paid as follows: Forty-nine one-hundredths ($49/100$) by the Jasper Land Company, and

Note that in the contract the purchasers "may notify" the grantors of such cutting and

removal. In the deed it is changed to read "shall notify" and describe "the land so cut."

Has this change of wording any meaning? Does it imply that in the contract the stipulation indicated a mere option or privilege of the purchaser to report the cut-over land and thus relieve himself of paying taxes thereon, while fifty-one one-hundredths ($51/100$) by the grantees herein."

in the deed it is made a duty, a right inuring to both parties? If so, it also argues that in drawing the deed there was a purpose to make it more definite and specific as to when the right to cut timber should cease.

In the study of these instruments as a whole, and in their several related parts, with a view of gathering the intention of the parties to the transaction, the subject-matter is of importance.

They were dealing with a large body of lands covering much of six different townships. An investment of $100,000 was to be made by the purchasers.

They were severing the title into three different estates, one taking the timber and logging rights, one the mineral and mining rights, and the grantor and grantee taking the surface right—the fee—as tenants in common. They contemplated both mining operations and logging operations on the same territory. These might go on concurrently, or separately. The mining operations on a given subdivision might go on indefinitely, while the logging operations thereon would be rather temporary. Either might precede the other in point of time. A definite fixing of the rights conveyed and the rights reserved entered into the consideration on both sides. They desired a workable contract. The only occasion when it would be material to ascertain what to cut would be in the indefinite future when the woodsman with his saw and axe went into the woods to cut. There was no haste contemplated in cutting off the timber sold. The right to begin was postponed for at least two years unless the purchaser advanced a stumpage price for entering sooner. The magnitude of the enterprise and the condition of future markets would enter into the calculations of the purchaser in making such investment. So no time limit was fixed for the removal of timber by the purchaser. Instead a majority interest in the fee was purchased carrying a right of entry at any time to remove the timber purchased. It would be manifestly impractical 10 or 20 years later to tell the size of a tree in 1902 or 1905. The general rule that a conveyance of timber by general description without more means merchantable timber is a necessary and proper one. Yet in practical operation it is often an indefinite and difficult one.

In Gulf Yellow Pine Lbr. Co. v. Monk, 159 Ala. 318, 49 South. 248, the court was dealing with a contract for "timber to cut 12 inches at the stump." It was argued this expression was meaningless. In answer to that contention the court said: "Timber is such stuff as is suitable for building and allied purposes." As applied to the contract then in hand, the expression was unquestionably correct. But as to hardwoods in general it may be said to be common knowledge that timber is marketed for the manufacture of handles, golf sticks, shuttles, outdoor furniture and many other purposes, which would be too small for build-

ing purposes and the like. "Merchantable timber" may vary in meaning from one year to another, and certainly from one decade to another. Certainly this implied meaning from the general words of a grant should not control express provisions defining the sizes of the timber to be taken by both parties to the transaction.

In the first contract nothing was shown as to size of timber that might be cut in mining operations. In exercising the usual mining privileges the natural thing would be to cut the most convenient stuff suited to the purpose. When the final closing of the deal was in hand, it is manifest a limit was put on this right—not exceeding six inches in diameter at the time of the cutting. This limit was certainly made in the interest of the purchaser of the timber. As a reciprocal protection to 'this mining privilege, the right of the logger to cut was also limited to timber exceeding six inches in diameter at the time of the cutting. The draftsman shows a careful exactness of expression so that a tree exactly six inches in diameter at the time of cutting should be reserved for mining operations. I cannot see how the clause "at the time of cutting" can have a definite meaning in the one case, and be a "meaningless expression" in the other. Both are used in the same connection and in a clause defining the relative rights of grantor and grantee in the timber conveyed.

I conclude that giving effect to the express terms of the deed, and in keeping with that certainty which was and is all-important in deeds of the sort, all timber exceeding six inches in diameter and up at the time of the cutting is conveyed to the grantee.

It does not follow from this that the grantee has a perpetual easement for the growth of the timber, with the right to repeatedly go over it and cut the timber exceeding six inches in diameter. This is controlled by the reverter clause in the deed itself. The parties were at liberty to provide when the right to cut should cease in such terms as they should choose. Taken as a whole, I think this clause contemplates the logging should be done in the usual orderly way, that when the land is cut over, it becomes the duty of the purchaser, in so far as it affects the rights of the grantor, to give notice of the fact, with a description of the subdivision so cut. Equity treats that as done which ought to be done. Thus construed, the deed carried the growing timber then on the land which should exceed six inches in diameter at the time of the cutting. When this timber is cut off, the smaller timber reverts to the owners of the fee, subject to mining rights reserved.

If we seek a reason for such terms, it may be inferred the parties best understood the kind of timber on the land. If virgin timber, there could be little increase in quantity of timber by future growth. In such case the timber as a whole may increase or decrease owing to its age and character. The new growth is chiefly for replacement of timber perishing from year to year by the casualties of the forest. The parties seem to have considered relief from taxes, and the amount tied up in the investment, as a sufficient inducement to cause a removal of the timber without trying to fix a limit of time thereon.

There was a balancing of interest by returning to the owners the fee of the cut-over lands on which the young growth would rapidly increase.

This seems to me to give effect to all the terms of the deed according to the real intent of the parties.